ROBERT C. MORAN & another[1] *vs.* ALBERTO M. GALA
& another.[2]

No. 05-P-732.

Suffolk. March 2, 2006. - April 14, 2006.

Present: COWIN, DREBEN, & MILLS, JJ.

*Estoppel. Adverse Possession and Prescription. Trespass. Real Property,*
Trespass.

In a civil action asserting adverse possession and trespass against the
defendants, the holders of record title to a portion of a parcel of land, the
judge properly granted summary judgment in favor of the defendants,
where principles of equitable estoppel barred the plaintiffs' claims as a
matter of law. [139-142]

CIVIL ACTION commenced in the Land Court Department on
October 2, 2000.

The case was heard by *Gordon H. Piper*, J., on a motion for
summary judgment.

*Robert C. Moran* for the plaintiffs.

*Richard B. Michaud* (*John B. Harkavy* with him) for the
defendants.

DREBEN, J. The issue in this case is whether principles of
equitable estoppel bar Robert Moran and his wife, Susan Mo-
ran, from bringing this action asserting adverse possession and
trespass against the holders of record title, their next door
neighbors, the Galas. A judge of the Land Court entered sum-
mary judgment for the Galas,[3] holding that Robert's actions and

---

[1]Susan Moran.

[2]Mary J. Gala.

[3]The judge also transferred counterclaims by the Galas for misrepresenta-
tion and violation of G. L. c. 93A to the Superior Court and entered final
judgment, making a determination that there was no just reason for delay. See
Mass.R.Civ.P. 54(b), 365 Mass. 820 (1974). By stipulation, the Galas' claims

conduct estopped Robert and Susan from asserting such claims. We affirm.

1. *The claims in the present action.* On October 2, 2000, Robert and Susan filed an action in the Land Court against the Galas, owners of a lot adjacent to their lot on Wildwood Street in Winchester, and against a contractor who was building a driveway for the Galas.[4] The Morans alleged that they, "their grantors, and predecessors in interest have actually occupied an area of land situated between the Plaintiffs' property and the Defendants' property . . . openly, notoriously, exclusively, adversely, and continuously for more than twenty (20) years."[5]

In an affidavit accompanying a request for a preliminary injunction,[6] Robert included the following: the property at 103 Wildwood Street was purchased by his parents in 1942 and they continuously lived there until his mother's death in 1992 and his father's death in 1993. Robert lived in the house from his birth in 1948 until 1970. Following the death of his parents, he purchased the property from his siblings in 1994 and has owned and occupied the property since that date. The area claimed is a narrow triangular-shaped piece of land between the Morans' lot and that of the Galas. Robert's affidavit also contains statements, apparently based on personal observation, as to how the area was used by the Morans for recreational purposes, how it was cultivated by the Morans and how it was enclosed at one time by a fence, and, until removed by the Galas, by a privet hedge.

The Galas' answer raised numerous defenses including that the plaintiffs' complaint is barred by principles of equitable estoppel by reason of their acts and conduct. It is unnecessary to detail the numerous filings in the case, suffice it to say that

against their grantors, and cross claims by these grantors against Robert Moran, were dismissed without prejudice.

[4]The action against the contractor and his cross claims against the Galas were subsequently dismissed by stipulation with prejudice.

[5]The Morans also asserted a second count, claiming the Galas trespassed on said land.

[6]Prior to trial the Morans were successful in precluding the Galas from paving a driveway on the disputed piece of land. The injunction was vacated as part of the summary judgment for the Galas.

the Galas eventually filed a motion for summary judgment which was allowed. The Morans appeal from that judgment.

2. *Undisputed facts in the summary judgment materials.* Robert is an attorney and has practiced law in Massachusetts since 1977. The Stowe family, the next door neighbors of the Morans prior to the sale of the property to the Galas, and the Moran family were on friendly terms; Robert was the godson of the senior Stowes and called them "uncle" and "Auntie Louise." In 1991, after the death of Lewis Stowe, Sr., Robert wrote to Lewis Stowe, Jr. (Lewis Jr.), enclosing a deed dated December 11, 1986, in which the senior Stowes conveyed the property to themselves and their two children, Lewis Jr. and Doreen Moore. Robert had prepared the deed and had notarized the signature of the grantors. The description contained in the December 11, 1986 deed showed ownership by the Stowes of the disputed parcel.

In February, 1997, Robert began representing Lewis Jr. and Moore in connection with the sale of the Stowe property to the Galas, and in March, 1997, Robert drafted a purchase and sale agreement. The description of the property in the purchase and sale agreement referred to the December 11, 1986 deed. After negotiations between Robert and the Galas' attorney, a slightly revised purchase and sale agreement containing the same description of the property was signed on March 24, 1997. Prior thereto, on March 20, 1997, Robert faxed to the Galas' attorney a proposed adjustment to the Moran parcel, to the soon-to-be Gala parcel, and to two other properties with frontage on Wildwood Street which would change the lots from parallelograms to rectangles. If the Galas (and the other owners) had agreed to this adjustment, it would have given the Moran parcel record title to the disputed area over which the Morans later claimed title by adverse possession. The Galas did not agree to the adjustment.

On May 30, 1997, the closing took place. The final deed to the Galas, drafted by Robert or someone under his direction, contained the same description, thus including the disputed triangular parcel in the conveyance to the Galas. Also, on May 30, 1997, Robert, pursuant to an attached power of attorney given to him by Lewis Jr. and Moore, and in their names, signed

a document entitled "Mechanic's Lien Certificate" addressed to First American Title Insurance Company. As Robert acknowledges in his brief, "[i]ts obvious purpose is to have First American issue a title insurance policy that would not take exception to 'unrecorded matters.' " The document states:

> "In consideration of your issuing said policy(s), without taking exception [to 'unrecorded matters which could be ascertained by an inspection of said premises or by making inquiry of persons in possession thereof' and 'mechanic's or materialmen's liens'], we hereby state an oath that:

> "1. there are no tenants, lessees or parties in possession of said premises other than _____ [left blank]."

In their responses to the Galas' requests for admissions, the Morans acknowledged that at no time from 1993 to 1996 did they bring to the attention of Louise Stowe or anyone in her family a claim for adverse possession of a portion of the Stowe property,[7] and Robert acknowledged that from the time he commenced his representation of the sellers of the Stowe property through the date of the closing on May 30, 1997, he did not mention to the Galas or their attorney that he "had and/or intended to assert an adverse possession claim to a portion of the Stowe property."

In an affidavit in opposition to the summary judgment motion, Robert stated that he had personal knowledge of the use and occupation of this property and the so-called disputed area, and that before this action,

> "I never handled an adverse possession claim in my professional career. In 1997, my knowledge of adverse possession was essentially what I learned in Property Law in my first year of law school in 1973-1974. I had a general knowledge of this legal concept but not a sufficient enough understanding to act upon it or advise a client."

By 1997, after the Stowes and his own parents had died, Robert

---

[7] In 1994 when Robert applied for a special permit because he wanted to build an addition on his property which would be in violation of the side setback near the Stowe property, the certified plot plans that were prepared for him were in accord with the record title.

"then believed, as [he does] now, that it was a good opportunity to adjust the lot lines of these properties to conform to the way in which the previous owners had actually used the land."

3. *Allowance of the Galas' motion.* The judge concluded that "the requisite elements of equitable estoppel are satisfied and that the Morans' adverse possession claim is barred as matter of law." After recognizing the correct standard for the allowance of a motion for summary judgment as set forth in our cases,[8] he quoted the following language of *Bongaards* v. *Millen*, 440 Mass. 10, 15 (2003):

> "Circumstances that may give rise to an estoppel are (1) a representation intended to induce reliance on the part of a person to whom the representation is made; (2) an act or omission by that person in reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission."

The judge considered that the position and assertions of the Morans in the present law suit — that Robert and his predecessors in title possessed the disputed area of the Galas' record parcel since 1942 — "squarely contradict" the position he took as counsel for and as a representative of the sellers in 1997. Although the Morans contest this conclusion, it is supported by undisputed facts.[9] Throughout the period leading to the final closing, Robert took actions that would lead the Galas reasonably to believe that they would have title to all the land described first in the purchase and sale agreement, and then in the deed. Moreover, Robert's proposed adjustment to the

---

[8]"Summary judgment is granted where there are no issues of genuine material fact, and the moving party is entitled to judgment as a matter of law. The moving party bears the burden of affirmatively demonstrating that there is no triable issue of fact." *Ng Bros. Constr., Inc.* v. *Cranney*, 436 Mass. 638, 643-644 (2002) (citations omitted). The inferences drawn from the summary judgment materials must be viewed in the light most favorable to the party opposing the motion. *Attorney Gen.* v. *Bailey*, 386 Mass. 367, 371, cert. denied sub nom. *Bailey* v. *Belotti*, 459 U.S. 970 (1982).

[9]Robert admitted that he "knew from his own deed to the Moran property, his own documentation for the Special Permit that he obtained in 1994, and/or from the deed to the Stowe property that the deed [he] provided to the Galas included the area that Attorney Moran now claims that he and Susan Moran own by adverse possession."

boundaries would reasonably be viewed as an acknowledgment of the boundaries as described in the Stowe and Moran deeds, and his desire to change the boundaries by a conveyance. Thus, even apart from the mechanic's lien certificate,[10] the Galas reasonably could rely on the description in the purchase and sale agreement and deed, documents prepared by Robert or under his direction, and Robert's proposed lot adjustment, as an implicit representation by him that he was not asserting a claim contrary to the descriptions in the documents he prepared. At the very least his conduct was an implicit representation that, based on facts that Robert knew at the time (it is irrelevant whether he knew such facts might constitute a viable claim of adverse possession), Robert and his wife were making no claim and would make no claim to the Galas' record title property. Obviously, had the Galas any inkling that the Morans would make a claim, they would have not gone through with the purchase without some adjustment or release. Also obvious is the detriment to the Galas — the cost and trouble of this litigation, as well as the possible loss of a portion of their land.

In their appeal, the Morans argue that summary judgment should not have entered as there were disputed material questions of fact. Robert argues that the Galas had already decided to purchase the property when he began to be involved in the transaction and therefore there was no reliance by them which led them to buy the property. At the least, he claims, whether they were induced to buy is a question of fact. What is here involved is not the inducement to enter into the purchase and sale agreement, but rather reliance on the implicit representations that Robert would not assert claims on his own and on his wife's behalf contrary to the documents he prepared. See *Colarusso* v. *Ragosa*, 382 F.3d 51, 61 (1st Cir. 2004). In that case, an unsuccessful bidder at an auction sale ordered by the bankruptcy court was estopped from asserting a claim of adverse possession against the successful purchaser at the sale. The court held that the participant, knowing that the bankruptcy

---

[10]We agree with the judge that since the certificate was supplied to induce the issuance of title insurance for the Galas and their purchase mortgagee, the fact that it was addressed to the title insurance company, rather than to the Galas, is without significance. The certificate facilitated the Galas' ability to insure their title and consummate the purchase.

court was purporting to release all third party interests, implicitly represented to the purchaser that she was not challenging the sale. *Ibid.* Although the question of reliance is often a question of fact, in an appropriate case it can, as here, present an issue of law. See *Cataldo Ambulance Serv., Inc.* v. *Chelsea*, 426 Mass. 383, 387 (1998).

As noted in *Looney* v. *Trimount Theatres, Inc.*, 282 Mass. 275, 278 (1933), quoting from *McLearn* v. *Hill*, 276 Mass. 519, 525 (1931) (italics omitted):

> "while the doctrine of estoppel in pais rests upon the ground of fraud, it is not essential that the representations or conduct giving rise to its application should be fraudulent in the strictly legal significance of that term, or with intent to mislead or deceive; the test appears to be whether in all the circumstances of the case conscience and duty of honest dealing should deny one the right to repudiate the consequences of his representations or conduct . . . ."[11]

Moreover, the judge's conclusion that "Moran was indisputably aware of the full facts on which he now bases his adverse possession claim throughout the time he was dealing with the Galas" is, contrary to the Morans' contention, supported by Robert's own affidavits. He asserted that he had "personal knowledge of the use and occupation of this property and the so-called disputed area" and that he had "general knowledge of this legal concept" (adverse possession). For this reason, there is additional support for allowing summary judgment in favor of the Galas. As stated in *Emmons* v. *White*, 58 Mass. App. Ct. 54, 61-62 (2003), "one may not knowingly stand by and allow one's land to be sold without asserting one's own title, yet thereafter assert an ownership interest against the purchaser." See *Vincent* v. *Plecker*, 319 Mass. 560, 561 (1946); *Colarusso* v. *Ragosa*, 382 F.3d at 60.

The Morans also claim that it would be inequitable for Susan

---

[11]As a member of the bar, and acting in that role (as well as for his own benefit, e.g., the adjustment proposal), Moran had at the very least this duty of honest dealing. That he was acting in different capacities in the two proceedings is not relevant. Moran cannot dispute that he had notice of and, indeed, prepared the deeds. See *Colarusso* v. *Ragosa*, 382 F.3d at 61.

to be bound by Robert's conduct as there is no evidence that Robert was acting as her agent. The whole record, however, is replete with evidence that although the parties took title in the names of Robert C. Moran and Susan Moran, Robert had full control of the property and made all decisions and signed all papers concerning it. Susan acknowledged in response to requests for admissions by the Galas that "[b]y 1994, Susan . . . desired to change the lot lines between the Moran and Stowe properties which would have added more land to the Moran property from a portion of the Stowe property." The adjustment plan proposed by Robert to the Galas was in accord with this desire. She knew that the property had been in Robert's family and that Robert, and not she, knew far more about the property, and her actions indicate she was not asserting any claims or defenses independently of Robert. He signed the complaint in this action. Even the application for a special permit made in 1994 was sought by Robert in his own name. While the application for a building permit was in both names, it was signed by Robert alone. Only he has filed affidavits in this case, and there is no affidavit or other suggestion by Susan that she did not wish Robert to act as her agent in trying to change the lot lines of the parcel. Cf. *Sztramski* v. *Spinale*, 332 Mass. 500, 504 (1955). If in his actions, Robert made representations such as acknowledging the lot lines as existing in the deeds, e.g., by the adjustment plan sent to the Galas, or by the application for the special permit and the 1994 certificate in the town files allowing the permit showing those lot lines, Susan cannot divorce herself from those actions. Like the husband joint owner in *Emmons* v. *White*, 58 Mass. App. Ct. at 59-60, Susan, for all that appears, left all decisions as to the property to her spouse, including those directed to trying to acquire the disputed land. She is, therefore, bound by his conduct and representations which estop both of them from making a claim of adverse possession against the Galas.

*Judgment affirmed.*