FabricaNT, Judith, J.
INTRODUCTION
This action presents a dispute regarding the calculation of rent due from the plaintiffs, Rogers Street, LLC and BMR-Rogers Street (tenant) to the defendants MBA-Rogers Street LLC, MBA-Cambridge LLC, and O&T Realty, LLC (landlord), under certain provisions of a commercial ground lease (lease). Before the Court are cross motions for summary judgment. For the reasons that will be explained, the tenant’s motion will be denied, and the landlord’s motion will be allowed in part and denied in part.
BACKGROUND
The record before the Court establishes the following facts as undisputed for the purposes of these motions. Defendants MBA-Cambridge and O&T Realty hold the fee interest in two properties located at 304-322 Binney Street and 301 Bent Street, with a total around area of 165,118 square feet (the property).[3] On March 30, 1999, they entered into a lease agreement for a term of 62 years with plaintiff Rogers Street.[4] The lease contemplated that the tenant would demolish the existing, antiquated industrial buildings on the site, construct new buildings (the project), and sublease space in the new premises to third parties. Under §6.03 of the lease, the tenant was required to obtain the landlord’s express approval of all schematic design plans prior to any construction or improvement on the property, and prior to any application for a building permit. Should the landlord disapprove of any aspect of the plans, it was required to so inform the tenant and state the grounds for disapproval. The lease provided for an annual “Fixed Ground Rent” set forth in an appended exhibit, designated “Exhibit E.”
In the fall of 1999, the tenant proposed to apply to the City of Cambridge Board of Zoning Appeals (BZA) for a permit to allow telecommunications use on the property. The landlord refused to approve the proposal, claiming that only uses permitted “as of right” could be built under the lease. This dispute resulted in a December 15, 1999, arbitration agreement and an amendment to the lease[5] to include, among other things, a revised Exhibit E, which provided as follows:
The annual Fixed Ground Rent for the Premises for each Rent Year shall be an amount equal to the total of (i) the Maximum Floor Area for the Properties up to 375,000 square feet multiplied by the sum of $4.00 plus (ii) the Maximum Floor Area for the Properties in excess of 375,000 square feet, if any, multiplied by the sum of $2.50, which amounts shall be increased as provided below. However, under no circumstances shall the Fixed Ground Rent for any Rent Year be less than $1,500,000, which amount shall be increased as provided in the next sentence. All of (a) the $4.00 and $2.50 amounts specified, respectively, in items (i) and (ii) above, and (b) the $1,500,00.00 amount specified in the preceding sentence shall be increased annually on January 1st of each year on a cumulative basis, by 3%, with the first such increase to be made on January 1, 2001.
The lease defines the Maximum Floor Area as “the reasonable maximum gross floor area (as defined in the Cambridge Zoning Ordinance) permitted by applicable zoning and land use regulations for the Property.”
Under the Cambridge zoning ordinance, gross floor area is measured by multiplying the length of each story of each building by its width, and adding the results for all stories. The zoning ordinance limits the gross floor area that can be built on a particular lot. The limit under the ordinance is calculated by multiplying the lot area of the property by the floor area ratio (FAR) applicable to the district in which the property lies. The applicable FAR, therefore, determines the maximum gross floor area of any structure that can be built on that lot. During the relevant period, the property was located in an Industry B -1 district, with a base FAR limit of 3.0. The ordinance allows certain *250 bonus FARs for properties used for housing, with a certain percentage allocated to affordable housing; these bonus provisions were not applicable to the property at the time the lease was executed, because housing was not allowed either as of right or by special permit in an Industry B-l district.
Beginning in August 1999, the tenant submitted to the landlord, and the landlord approved, a series of plans for the project.[6] On October 6, 1999, Cambridge advertised Ordinance 1234 (known as Larkin).[7] Larkin proposed an eighteen-month moratorium on the issuance of permits for any building, renovation, addition or demolition of any structure within an area that included the property. Despite the possible moratorium, the tenant on November 5, 1999, applied for special permits to build a telephone exchange (telecom building). In the meantime, the tenant and other developers negotiated for an amendment to Larkin, which would provide an exemption to the moratorium for any project over 100,000 square feet that consisted of a telecom building as well as at least twenty units of housing, if and when housing became a permitted use. The City adopted Larkin on January 24, 2000, including that exemption. The net effect of Larkin, as amended, was that the tenant was required to build at least twenty units of housing should housing be permitted prior to occupancy. On January 28, 2000, the BZA granted the tenant’s application for special permits to build structures with a maximum gross floor area of 495,330 square feet. The tenant began construction in July 2000.
On June 19,2000, Cambridge passed Ordinance 1240 (known as Housing in Industrial Districts or HID). HID allowed multi-family housing in Industry B-l districts, subject to the issuance of a special permit by the Planning Board should the proposed development exceed 50,000 square feet of gross floor area. HID increased the 3.0 FAR normally allowed for that area by 30%, provided that all additional gross floor area attributable to that bonus must be allocated to housing, with half of that to affordable housing as defined in the zoning ordinance. Thus the total FAR allowable for the property after June 19, 2000, was 3.9 (the base FAR of 3.0 plus 30%).
On June 27,2001, Cambridge advertised ordinance 1253 (referred to as ECAPS). ECAPS proposed to downzone the district from Industry B-l to Industry A-1. This had the effect of reducing the FAR.[8] On June 28, 2001, and consistent with the requirements of Larkin, the tenant obtained an amended permit to add 41 units of housing to the already existing office and laboratory space, with a gross floor area for the entire project of 506,904.[9] The City adopted ECAPS on October 15, 2001. Nonetheless, because the tenant had obtained the telecom permits in January 2000, it retained the right to build under the original base FAR of 3.0.[10] Finally, on April 18, 2002, after Larkin had expired, the tenant applied for a special permit to allow all or part of the gross floor area for which it had received permits for telecommunications use to be developed for laboratory/research and development uses.[11] The Planning Board allowed the permit on May 29, 2002, with the gross floor area remaining at 506,904.
The tenant started paying rent on the original 495,330 square feet in February 2000, before beginning construction in July of that year. Thereafter, the tenant increased its rent payments each year by an amount equal to 3% of the first year’s rent. By letter dated July 12, 2002, the tenant informed the landlord that it also intended to pay rent on the additional gross floor area allocated to housing as authorized by the Planning Board.
On three subsequent occasions, in 2002, 2004, and 2006, in connection with financing and subleasing transactions, the tenant requested from the landlord, and the landlord provided, estoppel certificates certifying the status of the tenant’s obligations under the lease. In each certificate the landlord represented that “(a)s of the date hereof, all Fixed Ground Rent and Additional Rent and other payments due under the Ground Lease are current,” and that “[n]o notice of an event of default has been given by the Ground Landlord under the Ground Lease, nor is Landlord aware of any existing circumstances that, with the passage or time, will constitute an event of default.”[12]
In 2006, in connection with an application to Anglo-Irish Bank for mortgage financing, the tenant requested another estoppel certificate. On August 9, 2006, the Landlord refused to provide the requested certificate and informed the tenant that it retained the right to pursue the tenant for additional rent due. The landlord then sent notice, dated November 17, 2006, demanding payment of $2,781,025.45 plus interest and penalties. The tenant responded by bringing this action for declaratory and injunctive relief. The landlord counterclaimed for corresponding declarations and for breach of contract.[13]
The gist of the controversy before the Court, described more fully below, is the parties’ dispute over how rent should be calculated under the lease. The landlord argues that (1) rent must be paid on the maximum floor area authorized under the zoning ordinance, regardless of the size of the building actually built; and (2) the annual rent must be increased on a compounded basis; that is, each year’s increase must equal 3% of the prior year’s rent. The tenant takes the position that (1) “reasonable” maximum floor area means the amount allowed by the permits issued by the Planning Board; and (2) the annual rent increase is 3% of the first year’s rent.
DISCUSSION
The relationship between a landlord and a tenant is a contractual one based on the terms of the lease executed between the parties. Williams v. Seder, 306 Mass. 134, 136 (1940). “Interpretation of language in a written contract is a question of law for the court, and if the words are plain and free of ambiguiiy, they must be construed in accordance with their ordinary and usual sense.” Massachusetts Mun Wholesale Elec. Co. v. City of Springfield, 49 Mass.App.Ct. 108, 111 (2000). The Court is not, however, required to read a contract in *251 a vacuum, or to ignore the context in which it was created. “Contract interpretation is largely an individualized process, with the conclusion in a particular case turning on the particular language used against the background of other indicia of the parties’ intention.” Starr v. Fordham, 420 Mass. 178, 190 (1995) (internal quotations and citations omitted). “A term is ambiguous only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.” County of Barnstable v. American Fin. Corp., 51 Mass.App.Ct. 213, 215 (2001). See also Suffolk Constr. Co., Inc v. Lonco Scaffolding, Inc., 47 Mass.App.Ct. 726, 729 (1999) (contract language ambiguous where “an agreement’s terms are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken”).
When contract terms are ambiguous, extrinsic evidence is a proper source for interpretation. Kobayashi v. Orion Ventures, Inc., 42 Mass.App.Ct. 492, 496 (1997). In that case, “preliminary negotiations, the conduct of the parties, and interviews between them after the contract is executed are relevant matters and are admissible in evidence, not to vary or enlarge the agreement, but to define the meaning of the terms the parties employ.” Rizzo v. Cunningham, 303 Mass. 16, 21 (1939). See also USM Corp. v. Arthur D. Little Sys., Inc., 28 Mass.App.Ct 108, 116 (1989) (“[e]xtiinsic evidence bearing upon the background and purpose of the parties, as well as their understanding of the meaning of particular language used in the contract, may be considered both in the construction of ambiguous contract language and in resolving uncertainties in applying the terms of the written contract to the subject matter”).
1. The Maximum Floor Area
The language in dispute here is “the reasonable maximum gross floor area (as defined in the Cambridge Zoning Ordinance) permitted by applicable zoning and land use regulations for the Property.” The landlord construes this to mean the maximum floor area allowable between June 19, 2000, when HID was passed, and June 27, 2001, when ECAPS was advertised; it calculates this to be 643,960 square feet, rather than the 506,904 square feet on which the tenant has been paying.[14] The landlord arrives at this figure first by establishing that the FAR available to the tenant under the zoning ordinance as of June 19, 2000, was 3.9 (the base FAR of 3.0 with the addition of a bonus FAR of 20% or .9 should the bonus be allocated to housing as permitted by HID). Under the zoning ordinance the maximum floor area is calculated by multiplying the FAR times the lot area, here 165,118 square feet. Using these figures, the maximum floor area is 643,960 square feet. Therefore, according to the landlord, had the tenant chosen to take advantage of the FAR housing bonus during that one-year window, it could have designed the project and applied for permits to build structures with that maximum floor area.
Focusing on the word “reasonable,” the tenant argues that the lease requires payment of rent based on the gross floor area authorized by permits that the Planning Board has actually issued, subject to an agreed-upon minimum figure of 375,000 square feet. The tenant points to the definition of the maximum floor area as that “permitted by applicable zoning and land use regulations for the Property,” and reads “permitted” as referring to the issuance of permits rather than what may be allowed under the zoning ordinance. Although the word “reasonable” certainly poses a challenge to interpretation, as will be discussed further infra the Court is not persuaded by this reading of the definition. The phrase “permitted by” is directly followed by “applicable zoning and land use regulations.” The word “permitted” does not, in the Court’s view, indicate permits issued, but means allowed by the applicable regulations.
The tenant next points to those portions of the lease that acknowledge the possibility of construction of less than the maximum floor area, but not less than 375,000 square feet. It cites §603(A) of the lease, which provides, in pertinent part, that the plans for the project submitted for approval “shall be drawn so as to include no less than the lesser of 450,000 square feet of gross floor space or the Maximum Floor Area, but in no event less than 375,000 square feet of gross floor space.” The tenant also notes that Exhibit E contemplates the construction of as little as 375,000 square feet, in that it states that the area in excess thereof, “if any,” shall be multiplied by $2.50. These provisions demonstrate, the tenant claims, that the parties expressly provided for a scenario in which the space upon which the tenant would pay rent could have been anything over 375,000 square feet. Moreover, given these provisions, the tenant argues, it had an incentive to maximize the floor area, since in doing so it would save $1.50 per square foot.
Again, the Court is not persuaded. The inclusion in the lease of a minimum floor area simply indicates that the landlord required the tenant to build structures of at least that square footage. If the tenant had failed to secure permits to build a project with that minimum floor area, under §607(B) the landlord could have terminated the lease. The size of the structures the tenant eventually chose to build, as long as they met the minimum floor area required, would not determine the amount of rent due. Otherwise put, the landlord would collect rent based on “the reasonable maximum gross floor area (as defined in the Cambridge Zoning Ordinance),” regardless of the gross floor area of the building as built.
For the same reasons, the landlord’s approval of the tenant’s plans showing a floor area of between 495,330 square feet and 506,904 square feet need not affect the rent. Under the Landlord’s interpretation, the rent would be the same regardless of what size building the tenant chose to erect. The landlord therefore would *252 have no reason to disapprove plans calling for a floor area less than the maximum allowable under the zoning ordinance.
That said, the Court is left puzzling over the meaning of the word “reasonable” in the definition of maximum floor area, for which neither side has offered a satisfactory explanation. The landlord’s construction of “reasonable maximum gross floor area” renders the word “reasonable” superfluous, since if rent was supposed to be calculated on a purely mathematical formula based solely on the maximum allowable under the ordinance, there would be no occasion for the exercise of any “reasonable” judgment or discretion. “[E]veiy word and phrase of a contract should, if possible, be given meaning, and ... none should be treated as surplusage if any other construction is rationally possible.” Computer Sys. of America v. Western Reserve Life Assurance Co. of Ohio, 19 Mass.App.Ct. 430, 437 (1985). See also Gustafson v. Wachusett Regional Sch. Dist., 64 Mass.App.Ct. 802, 807 n.7 (2005) (language upon which controversy hinges may not be treated as superfluous or meaningless).
“Reasonable” is not defined in the lease, nor it is self-defining. Black’s Dictionary defines “reasonable” as “(flair, proper, or moderate under the circumstances.” Black’s Law Dictionary 1272 (7th ed. 1999). When parties to a contract use a vague word that must be interpreted according to the surrounding circumstances, it is for the finder of fact to “ascertain the meaning intended to be attached to the words by the parties who used them . . .” Kobayashi, 42 Mass.App.Ct. at 497 (internal quotations and citations omitted). See also Fecteau Benefits Group v. Knox, 72 Mass.App.Ct. 204, 211 (2008) (if a clause in a contract is ambiguous, jury “properly called upon to resolve the intent of the parties”).
The landlord’s reading poses another problem as well: it leaves open which version of the ordinance determines the calculation. The FAR allowed at the time the parties executed the lease and at the time the tenant starting paying rent was less than that allowed when HID became effective, but more than that under the subsequent downzoning, and further changes could occur at any time during the term of the lease. The landlord has chosen the time period when the highest FAR was allowed, but nothing in the lease language provides guidance on the question.
Each side offers extrinsic evidence to support its position, including testimony and documents related to the negotiations leading to execution of the lease, as well as conduct and statements of the parties in the course of its implementation. The Court would not consider such evidence if the terms of the lease were unambiguous, such that the Court could interpret it as a matter of law. The Court concludes, however, that the language presented is not susceptible of such interpretation, and that the evidence offered supports conflicting inferences. It follows that the parties’ disagreement over the meaning of the lease provision presents a genuine dispute of material fact for trial, and the Court cannot grant summary judgment to either side on this issue.
2. The Rent Escalation
The second bone of contention between the parties is the method by which the annual rent increase should be calculated. Exhibit E provides that “(a]ll of (a) the $4.00 and $2.50 amounts specified, respectively, in items (i) and (ii) above, and (b) the $1,500,000.00 amount specified in the preceding sentence shall be increased annually on January 1st of each year on a cumulative basis, by 3%.” The landlord argues that this provision requires that rent be compounded annually, so that each year the rent increases by 3% of the previous year’s rent. The tenant takes the position that the fixed ground rent is to be increased each year by the same fixed amount: 3% of the amount of the fixed ground rent for the first year.
In the Court’s view, the language of this provision in the lease is clear and unambiguous. The lease provides that rent is to be increased annually by 3% — that is, 3% of the previous year’s rent. The tenant seems to contend that the addition of the word “cumulative” somehow changes the meaning of the phrase “increased annually” to indicate “by the same fixed amount.” As support therefor, the tenant points to the definition of “cumulative” as “(a]dditional; heaping up; increasing; forming an aggregate.” Troy v. American Fid. Co., 120 Vt. 410, 420 (1958) (quoting Black’s Law Dictionary, 1958 ed.). But nothing in that definition precludes compounding. To increase rent each year by 3% of the previous year’s rent certainly falls within the dictionary definition of “cumulative.” See, e.g., http://dictionary.reference, com/browse/cumulative (“cumulative” defined as “increasing or growing by accumulation or successive additions resulting from accumulation or the addition of successive parts or elements”).
The Appeals Court in two cases has construed “cumulative” as synonymous with “compounded.” In Duane Realty Corp. v. Great Atl. & Pac. Tea Co., 8 Mass.App.Ct. 899, 900 (1979), the court noted that because an escalation clause did not indicate that the increase was to be based on the preceding year, it was “non-cumulative.” In like manner, the court in Blount v. Denault, 27 Mass.App.Ct. 524, 526 (1989), stated that “[a] clause containing language basing the increase on the prior year’s tax rate may be construed so as to operate cumulatively.”[15]
Percentage clauses are often used in commercial leases “as a hedge against inflation for the landlord.” E.G. Daher & H. Chopp, Landlord & Tenant Law (3rd ed. 2000) Pocket Part §9:46. Although the parties have identified no Massachusetts appellate decision that addresses this issue, courts in other jurisdictions have routinely construed leases as tying incremental increases to increases in the cost of living or the Consumer Price Index. See, e.g., Bakas Restaurant v. Charos, 111 A.D.2d 360, 361 (N.Y. 1985); Bramsen Distributor, Inc. v. Mastroni, 726 P.2d 610, 614 (Ariz. 1986) (parties agreed *253 to escalation clause based on rate of inflation); Barnes v. Wood, 750 P.2d 1226, 1232 (Utah 1988) (escalation clause intended to use Consumer Price Index); GDH Restaurant, Inc. v. Lorraine Murphy Manhasset, Inc., 159 A.D.2d 459 (N.Y. 1990) (commercial lease included cost of living rent escalation clause).
Here, the Court construes the language of the lease to require that rent be compounded yearly; that is, each year’s rent is to be increased by 3% of the previous year’s rent. The landlord is entitled to judgment as a matter of law on this issue.
3. Estoppel
The tenant argues that the three estoppel certificates issued by the landlord in connection with financing and third-party leases, as well as the landlord’s course of conduct in accepting rent without objection, operate to estop the landlord from claiming that the tenant has failed to meet its rent obligations. The essential factors giving rise to an estoppel are (1) a representation, or conduct amounting to a representation, intended to induce a course of conduct on the part of the party to whom the representation is made; (2) an act or omission resulting from the representation, whether actual or by conduct, by the party to whom the representation is made; and (3) detriment to that party as a consequence of the act or omission. Turnpike Motors, Inc. v. Newbury Group, Inc., 413 Mass 119, 123 (1992). The purpose of the doctrine is “to prevent one from benefiting from his own wrongdoing and to avoid injustice.” The Renovator’s Supply, Inc. v. Sovereign Bank, 72 Mass.App.Ct. 419, 426 (2009) (internal quotations and citations omitted). Es-toppel is designed to prevent “results contrary to good conscience and fair dealing.” Id The burden is on the party claiming estoppel to prove the presence of all three elements. Clickner v. Lowell, 422 Mass. 539, 544 (1996).
The tenant’s claim in this regard fails for the reason, if no other, that it has not shown any detrimental reliance upon the estoppel certificates or the landlord’s acceptance of rent. Fairness is the operative concept; and the essential question before the Court is whether the results of the tenant’s reliance upon the Landlord’s representations were unfair or inequitable to the tenant.
The tenant mistakenly relies on Moran v. Gala, 66 Mass.App.Ct. 135, 140 n.10 (2006), for the proposition that estoppel is appropriate even where the action was intended to induce reliance by a third party. In Moran, the plaintiff claimed adverse possession of a portion of land adjacent to his own, after having acted as attorney for the seller in connection with the sale of the same land to the defendants. In the sale transaction the plaintiff made a set of explicit and implicit representations, including signing a certificate to the defendant’s insurer, that there were no parties in possession of the property other than the sellers. Id at 138. In holding the plaintiffs claim barred by estoppel, the Appeals Court concluded that “the [defendants] reasonably could rely on the description in the purchase and sale agreement and deed, documents prepared by [the plaintiff], . . . and [plaintiffs] proposed lot adjustment, as implicit representation . . . that [the plaintiff] was not asserting a claim contrary to the descriptions in the documents he prepared.” Id at 140. Had the defendants “any inkling that the [plaintiffs] would make a claim, they would not have gone through with the purchase without some adjustment or release. Also obvious is the detriment to the [defendants] — the cost and trouble of this litigation, as well as the possible loss of a portion of their land.” Id The court further noted, with respect to the certificate issued to the insurer, that “since the certificate was supplied to induce the issuance of title insurance for the [defendants] and their purchase mortgagee, the fact that it was addressed to the title insurance company, rather than to the [defendants] is without significance. Tbe certificate facilitated the [defendants’] ability to insure their title and consummate the purchase.” Id at 140 n. 10.
Here, nothing in the record before the Court identifies any reliance comparable to that in Moran, or any harm to the tenant as a result of the landlord’s representations in the certificates or its acceptance of rent. The only harm the tenant cites in its memorandum is its investment in constructing the building. But nothing in the evidence would support a finding that the tenant would have abandoned the project, and avoided that investment, or that it would have built the building differently, if it had understood the landlord’s interpretation of the rent provisions of the lease at the time it first began to pay rent, or at the time of the first estoppel certificate in 2002.
When pressed at argument, the tenant proffered two theories: it would have engaged the landlord in further negotiation, as it had in 1999, leading to a result comparable to the amended Exhibit E that the parties negotiated then; and its lender in 2002 would have refused the loan. By the time of the first estoppel certificate in 2002, the project, and the tenant’s investment in it, was well underway.[16] An assertion of default might well have given the lender pause, but no evidence suggests that the tenant would simply have abandoned the investment it had already made. The far greater likelihood, it appears, is that the tenant would have either acceded to the landlord’s demand, or negotiated an arrangement that would have satisfied the lender while preserving the issue for judicial resolution. As for the outcome of any negotiation that might have occurred earlier, the Court cannot speculate, and would not permit a jury to do so.[17] The evidence reveals no unfairness to the tenant arising from the landlord’s representations and course of conduct. Accordingly, the tenant’s claim of equitable estoppel fails as a matter of law.
CONCLUSION AND ORDER
For the reasons stated, Plaintiffs Rogers Street, LLC and BMR-Rogers Street LLC’s Motion for Summary Judgment is DENIED. Defendants MBA-Rogers Street LLC, MBA-Cambridge LLC and O&T Realty, LLC’s Motion for Summary Judgment is also DENIED as to the *254 issue of maximum floor area; the Motion is ALLOWED as to the rent escalation provision. Counsel are directed to confer as to a date for final pretrial conference and contact the clerk at the earliest opportunity.

On July 6, 2000, defendants MBA-Cambridge LLC, and O&T Realty, LLC, deeded their interest to defendant MBA-Rogers Street LLC, which is the current landlord. For the purposes of these motions, the Court will refer to these entities collectively as defendants, or landlord, unless otherwise noted.

On April 4, 2007, BMR-Rogers Street LLC acquired Rogers Street’s interest in the lease. BMR-Rogers is the current tenant. For the purposes of these motions, the Court will refer to these entities collectively as plaintiffs or tenant unless otherwise noted.

The lease had previously been amended (minimally) on August 5, 1999.

The tenant submitted the original schematics, a drawing set, and the initial BZA application at various times between August 1999 and December 1999. The landlord approved the plans and the applications for special permits as part of the December 15, 1999, arbitration agreement. The tenant submitted revised plans and drawings in March 2000 and April 2001. Although it is not entirely clear from the record, it appears that these plans described a maximum floor area of either approximately 495,330 or 506,904 square feet.

The date an ordinance is advertised is important because under the zoning ordinance, if the City ultimately adapts a zoning provision, that provision applies retroactively to the date it was advertised. Thus if an owner obtains a special permit or a building permit after the advertising date, it must comply with the requirements of any previously advertised provision that is adopted.

The parties disagree as to the resulting FAR for the property, but it appears that for different portions of the property it ranged from 1.50 to 2.0. The landlord asserts that the FAR was doubled to the extent housing was built, and that, spread out along the properly, the average FAR was 3.6. The tenant disputes this assertion.

Gross floor area under the ordinance specifically excludes “basement and cellar areas devoted to the operations and maintenance of the building such as heating and cooling equipment, electrical and telephone facilities, and fuel storage.” Thus, square footage available to rent to third parties could be higher than the gross square footage recognized under the ordinance and used to calculate rent paid to the landlord. Telecom use requires more mechanical space than does residential use. The landlord asserts, and the tenant does not dispute, that there are actually 681,092 square feet of floor area on the property, of which 169,950 square feet are mechanical space. According to the landlord, the tenant could have built a building that would have had a gross floor area of 643,960 square feet recognized under the zoning ordinance; indeed, the landlord points out, the tenant gave that figure as the maximum gross floor area in an “Inclusionary Housing Plan Summaiy” that it submitted to the Planning Board. The tenant responds that its use of that figure in that document was merely as a theoretical maximum, with no relation to any plan or permit. The tenant asserts that it would have been impossible as a practical matter to convert the then existing design to one with a gross floor area of 643,960 during the one-year window in which the allowable FAR was 3.9. It cites, among other obstacles, zoning constraints other than FAR, the risk of obtaining a permit that could then be invalidated by subsequent downzoning, and the time-consuming and expensive process required to obtain a special permit.

To lock in the 3.0 FAR, the tenant was required to, and did, begin construction on the project no later than six months after the initial grant of special permits — by July 28, 2000. The parties do not dispute that the FAR was thus preserved.

 Che landlord approved the April 18, 2002, application, which gave the gross floor area of the project as 506,904 square feet.

The first certificate, dated December 27, 2002, was issued in connection with the tenant’s application for a loan from Merrill Lynch Capital. The 2004 certificate, dated May 14, 2004, recited that it was issued “in order to induce” Schlumberger Technology Corporation to enter into a lease with the tenant, and that the landlord executed the document “with the express knowledge that STC is relying upon the representations made herein in executing a lease with the Tenant.” The third certificate, dated November 30, 2005, makes the identical representations in connection with a Lease between the tenant and Schering Plough Research Institute.

The tenant’s Amended Complaint, dated October 19, 2007, seeks declaratory judgment that: it has properly calculated the rent (count I); the landlord has waived any right to claim that rent has not been properly calculated (count II); and the landlord is estopped by its conduct and representations from claiming the rent has not been properly calculated (count III). The landlord counterclaimed for breach of contract (count I) and seeks declaratoiyjudgment as to the calculation of rent (count II), and the tenant’s default (count III). On March 19, 2007, the Court dismissed count IV of the landlord’s counterclaim, which sought a declaration that the tenant was not entitled to reimbursement for incremental construction costs associated with the disposal of excavated soil at a lined landfill.

As described supra, initially the tenant paid rent on a maximum floor area of 495,330 square feet. This amount was arrived at by multiplying the 3.0 FAR then applicable by the total area of the lot. The tenant does not dispute this method of calculation. When HID was passed, the tenant added two floors of housing to the project, since ceilings in housing space can be lower than those in space used for telecommunications. In this manner, the tenant was able to add stories and thus increase the gross floor area. The tenant did not, however, take advantage of the FAR bonus of 30% allowed when half of housing space is allocated to affordable housing.

Both cases addressed tax escalation clauses.

 Construction originally began on July 12, 2000, but was halted in April 2001, following an appeal of the project’s building permits. Construction resumed on December 10, 2001.

The Court notes that it does not accept the landlord’s assertion that, prior to November 2006, it was unaware that the tenant was not paying the full rent due. The maximum gross floor area upon which it now claims rent is a matter of simple calculation; nothing would have prevented the landlord, a sophisticated business entity, from performing that calculation and comparing the result with the rent actually paid.